**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| ROBERT HOPPLE, ) | |
| SHAWN MESEY, and ) | |
| STEFANI RUDIGIER, ) | |
| On behalf of themselves and all others ) | |
| similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 4:20-cv-1838 RWS |
| ) | |
| ST. FRANCOIS COUNTY, ) | |
| ) | JURY TRIAL DEMANDED |
| ADVANCED CORRECTIONAL ) | |
| HEALTHCARE, INC., ) | |
| ) | |
| SHERIFF DANIEL ) | |
| BULLOCK *in his official capacity* ) | |
| *as Sheriff of the St. Francois County Sheriff's* ) | |
| *Department*, ) | |
| ) | |
| DENNIS SMITH *in individual capacity* ) | |
| ) | |
| ) | |
| HEATHER SMITH, LPN, *in her individual* ) | |
| *capacity*, ) | |
| ) | |
| JOHN DOE CORRECTIONAL OFFICER, *in* ) | |
| *his individual capacity,* ) | |
| ) | |
| Defendants. ) | |

**FIRST AMENDED COMPLAINT**

1.     Pretrial detainees at the St. Francois County Jail endure extreme temperatures;

hunger; inconsistent and inadequate provision of medical, dental, and mental health care; unsafe

and unsanitary conditions; overcrowding; and a culture of fear created by frequent violence and

retaliation by deputies at the jail. These conditions, which have been brought before St. Francois

County officials repeatedly over years by detainees, in media reports, and through litigation,

1

violate basic standards of human decency as well as the United States Constitution.

2.      The pretrial detainees have not been convicted of any crime and are presumed innocent and cannot be punished. Pretrial detainee jail conditions that amount to punishment of any kind are unconstitutional as they violate the detainees' due process rights under the Fourteenth Amendment.

3.      Post-conviction detainees are also incarcerated at the St. Francois County Jail. The Eighth Amendment similarly requires jail officials to provide humane conditions of confinement after conviction and prohibits punishment that is cruel and unusual.

4.      Defendants systematically and knowingly (1) denied the minimal necessities to individuals confined at the jail by subjecting them to appalling and inhumane conditions; (2) were deliberately indifferent to the medical, mental health, and dental needs of individuals confined at the St. Francois County Jail; and (3) discriminated against and failed to accommodate people with disabilities.

5.      Plaintiffs for themselves, and on behalf of those similarly situated, bring this civil action pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiffs seek in this civil action the vindication of their rights, a declaration that the Defendants' conduct was unlawful, and compensation for the conditions they endured at the St. Francois County Jail.

**JURISDICTION AND VENUE**

6.      This is a civil rights action arising under 42 U.S.C. § 1983; 28 U.S.C. § 2201, et seq., the Eighth and Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Amendments Act (ADAA), 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      Jurisdiction supporting Plaintiffs' claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

9.      Venue is proper under 28 U.S.C. § 1391(b) because all the events alleged herein occurred within the State of Missouri and all of the parties were residents of the State at the time of the events giving rise to this litigation.

10.     Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in St. Francois County, Missouri, and Plaintiffs and Defendants resided in the Eastern Division at all times relevant. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

11.     Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

12.     Plaintiff Robert Hopple (hereinafter, "Mr. Hopple") is a 51-year-old resident of Bonne Terre, St. Francois County, Missouri. Mr. Hopple was a pretrial detainee in the St. Francois County Jail from May 4, 2018, to on or around October 23, 2018. During this period, Mr. Hopple was subjected to various unconstitutional conditions.

13.     Plaintiff Stefani Rudigier (hereinafter, "Ms. Rudigier") is a 27-year-old resident of Maplewood, St. Louis County, Missouri. Ms. Rudigier was a pretrial detainee at the St. Francois County Jail from on or about March 5, 2017, to on or about March 3, 2019. During this period, Ms. Rudigier was subjected to various unconstitutional conditions.

14.     Plaintiff Shawn Mesey (hereinafter, "Mr. Mesey") is a 31-year-old resident of Jefferson City, Cole County, Missouri. Mr. Mesey was a pretrial detainee at the St. Francois County Jail from on or about the following dates, during which time, he was subjected to various unconstitutional conditions:

    a.   November 4, 2016 to November 5, 2016;

    b.   November 24, 2016 to November 29, 2016;

    c.  February 14, 2017 to February 17, 2017;

    d.  October 19, 2017 to June 18, 2018;

    e.  July 30, 2018 to August 4, 2018;

    f.  August 6, 2018;

    g.  October 30, 2018 to October 31, 2018;

    h.  January 4, 2019; and

    i.  April 11, 2019 to May 2, 2019.

15.    Defendant St. Francois County (hereinafter, "SF County") is a political subdivision of the State of Missouri and is a person for the purposes of 42 U.S.C. § 1983. SF County operates the St. Francois County Jail (hereinafter, "the SFCJ") and was, at all relevant times mentioned herein, responsible for the actions, inactions, policies, procedures, practices, and customs of the St. Francois County Sheriff's Office and its respective employees and/or agents.

16.    Defendant Advanced Correctional Healthcare, Inc. (hereinafter, "ACH") is an Illinois corporation that regularly conducts business in the State of Missouri. Upon information and belief, since at least 2016, SF County contracted with ACH to provide medical services at its jail.

17.    Defendant Dan Bullock (hereinafter, "Sheriff Bullock") was at all times relevant herein the Sheriff of St. Francois County with the responsibility of operating the SFCJ. Upon information and belief, Sheriff Bullock is a resident and citizen of the State of Missouri, acted under color of state law and acted in his capacity as the Sheriff for SF County and in the course and scope of his employment for SF County. Sheriff Bullock was and is responsible for training and supervising all deputies and staff at the SFCJ, for setting the policies, practices, procedures, and customs at the jail, and for ensuring the health and welfare of all persons detained at the jail.

18.    Defendant Dennis Smith (hereinafter, "Administrator Smith") was the Jail

Administrator at the SFCJ from on or around June 1, 2003, to December 31, 2019. Upon information and belief, Administrator Smith is a resident and citizen of the State of Missouri. At all times relevant to this action, Administrator Smith acted both under color of state law in his capacity as the Jail Administrator for the SFCJ and in his individual capacity. As Jail Administrator, Administrator Smith was responsible for managing the day-to-day operations and executing policies, procedures, practices and customs at the SFCJ. Administrator Smith is sued in his individual capacity.

19.     Defendant Heather Smith (hereinafter, "Nurse Smith") is and was, at all times relevant herein, a SF County employee working as a Licensed Practical Nurse (LPN) at the SFCJ. Upon information and belief, Nurse Smith is a resident and citizen of the State of Missouri and was at all times relevant acting both under the color of state law in her capacity as the LPN for the SFCJ and in her individual capacity. Nurse Smith was responsible for ensuring detainees received adequate medical care. Nurse Smith is sued in her individual capacity.

20.     Defendant John Doe Correctional Officer ("Defendant John Doe") was, at all times relevant herein, a SF County employee. Defendant John Doe is sued in his individual capacity.

## FACTUAL ALLEGATIONS

21.     SF County owns and operates the SFCJ located at 1550 Doubet Road in Farmington, Missouri.

22.     In or around 1996, the County purchased a building that was used on a dairy farm and added the west side sally port, holding cells, showers, pods, kitchen, recreation room, special housing units, solitary confinement and protective custody cells to the structure.

23.     The west side of the building contains the sally port, the booking desk and eight units (R1-R8), which are supposed to be used for holding detainees for less than twenty-four hours, detainees brought to SFCJ on habeas writs, detainees serving weekend sentences, and detainees

who have medical needs.

24.    SF County has used the R1-R8 holding cells throughout the class period to house as many as ten to twelve people in each holding cell at a single time.

25.    The SFCJ can house approximately 168 detainees, and the average daily population is 136 detainees. There are approximately 40 beds set aside for women in the "F" pod.

26.    The SFCJ population routinely exceeded 200 persons and, according to a recent government report, held approximately 300 people.

27.    The St. Francois County Sheriff's Department is responsible for the SFCJ. The Sheriff maintains the jail facility. As part of his responsibilities in operating the jail, the Sheriff is responsible for the jail's financial obligations, including paying bills and maintaining equipment. The Sheriff reports the budget to SF County's Treasurer, Auditor, and County Commissioner. The Sheriff is responsible for hiring deputies and staffing the SFCJ. The St. Francois County Sheriff is the final policymaker for SF County pertaining to the SFCJ and ultimately responsible for providing training and determining the policies, practices, and customs for the SFCJ. While the Sheriff is an elected position, St. Francois County Sheriff's Department deputies are employees of SF County.

28.    The St. Francois County Sheriff delegates the oversight of the day-to-day operations of the SFCJ to the Jail Administrator. The Jail Administrator directly oversees jail staff and is responsible for setting the jail work schedule, providing training, assigning duties, and ensuring the policies, practices, and customs of the SFCJ are followed. The Jail Administrator reports directly to the St. Francois County Sheriff.

29.    Upon information and belief, SF County received federal funds to assist with jail operations, including federal funds to house federal detainees.

30.    Since 2016, SF County has contracted with ACH to provide detainee medical care

at the jail. Pursuant to this contract, the ACH physician and/or mid-level practitioner should visit the jail weekly and be available twenty-four hours a day, seven days a week, to ensure detainees receive adequate medical care. Upon information and belief, Doctor Charles Pewitt, D.O. was and is the physician hired by ACH to provide medical care and treatment to detainees at the SFCJ at all times relevant to this complaint.

31.     At all times relevant to the complaint, the jail nurse was hired by the Sheriff and employed by SF County and, along with the deputies, was responsible for providing immediate care and treatment to detainees at the jail. The nurse is supposed to be available twenty-four hours a day, seven days a week, to ensure detainees receive adequate medical care. However, Nurse Smith would often not respond to calls or texts from deputies requesting medical assistance on behalf of detainees.

## Jail Conditions

## Unsanitary and Unhealthy Conditions: Overflowing sewage, black mold, and unhygienic conditions

32.     SF County subjected people confined pretrial and postconviction in the SFCJ, including Plaintiffs and class members, to substantial risk of harm, injury, or death by exposing them to unsanitary and unhealthy conditions, including overflowing sewage and black mold. SF County failed to consistently provide cleaning supplies, failed to provide staff to clean the facility, and failed to employ sufficient remediation measures to eradicate inhumane and unsanitary conditions at the SFCJ.

33.     Defendants SF County and Sheriff Bullock have been aware of these unsanitary conditions since at least 2017 when the U.S. Marshals Service cited the unsanitary conditions of the jail and revoked SF County's contract to receive federal detainees.

34.     Mr. Hopple, Ms. Rudigier, and Mr. Mesey constantly saw black mold while

detained at the SFCJ, especially in the living quarters and bathing areas.

35.    SF County made no significant efforts to remedy the dangerous condition posed by mold.

36.    Toilets, sinks, and showers in the living area were filthy and regularly experienced plumbing problems. For example, during Mr. Hopple's detention, he observed toilets and sinks overflowing, forcing Mr. Hopple and other detainees to navigate urine and feces in order to use restroom facilities.

37.    The showers at the SFCJ were unusable because the water was so hot it would scald their skin. When Mr. Hopple requested the deputies decrease the water temperature, SFCJ staff decreased the water to a temperature so that cold detainees could not use it. Essentially, the extreme temperatures in the shower at the SFCJ made it impossible for Plaintiffs to adequately and safely bathe while they were detained.

38.    Cleaning supplies are rarely used at the SFCJ. Deputies do not consistently provide cleaning supplies, and what supplies are given are inadequate to meet the cleaning needs of the detainees. Deputies themselves do not clean the SFCJ and rely on the detainees to do so and provide a single bucket of water and mop to each of the men and women's dorms.

**Inadequate Medical Care**

39.    Defendants SF County, Sheriff Bullock, Administrator Smith, and Nurse Smith were all responsible for responding to and providing medical treatment to detainees at the SFCJ.

40.    Upon information and belief, Nurse Smith was only available during weekdays from 7:00 AM to 3:00 PM. Upon information and belief, Nurse Smith was responsible for her own hours and routinely left before the end of her shift.

41.    Nurse Smith routinely failed to respond to calls for medical treatment on nights and weekends.

42.     SF County engaged ACH to provide consultation services, diagnostic testing, hospital services, and dental care to detainees at the SFCJ.

43.     Under the contract with SF County, ACH was to make a physician and/or mid-level practitioner available to SF County twenty-four hours a day. This physician and/or mid-level practitioner was supposed to visit the facility weekly, or as otherwise agreed to by ACH and SF County.

44.     Dr. Charles Pewitt was the physician assigned by ACH to visit the facility.

45.     Upon information and belief, Dr. Pewitt did not visit the SFCJ weekly.

46.     As a result, there was no adequately trained medical professional available if detainees required emergency medical treatment during evenings and/or weekends.

47.     During weekday shifts, when detainees were out of their cells, they could request medical care by directly asking a deputy or the nurse, by filling out a medical request slip if they were available, or by pressing the emergency medical call button near the entrance to the pods, which is where detainees were housed once they were booked into the SFCJ. When detainees were locked down in their cells, there was no way to request medical care other than banging on the door and walls and crying out for the deputies' attention.

48.     SF County segregated detainees who requested or needed medical care on nights and weekends in one of the holding cells until the next shift the nurse was available instead of providing medical care on nights and weekends.

49.     SF County also assessed fees to detainees for verbal and written requests for medical care, even if they did not receive medical care.

50.     There was no way for detainees to follow up on their request or appeal a denial or lack of response to a request for medical care.

**Overcrowding, Inadequate Staffing and Staff Training, Violence, and Retaliation from**

**SFCJ Staff**

51.     SF County has a history of overcrowding at the jail.

52.     Overcrowding at SFCJ subjected Plaintiffs and all those confined at the SFCJ to a substantial risk of harm, injury or death.

53.     SF County's failure to provide adequate training to deputies subjected Plaintiffs and all those confined at the SFCJ to a substantial risk of harm, injury, or death.

54.     SF County's lack of oversight, lack of training, and lack of supervision of deputies working at the SFCJ created an environment that promoted violence and retaliation. Deputies promoted violence between detainees in a cruel and inhumane practice called Friday Night Fights.[1]

55.     Friday Night Fights occurred during evening and weekend shifts when deputies would select two detainees to fight each other for the entertainment of the deputies.

56.     Detainees were frequently injured during these fights. However, since these fights occurred on nights and weekends, no medical assistance was available until Nurse Smith's next shift.

57.     Upon information and belief, deputies also retaliated against detainees who requested medical care by placing them in segregation or solitary confinement, also known as "the hole" or by placing detainees in the restraint chair.

**Extreme Cold**

58.     SF County has subjected and continues to subject all people confined at the SFCJ, including Plaintiffs and class members, to a substantial risk of harm, injury, or death by failing to employ sufficient devices and mechanisms to mitigate the extreme cold.

59.     During winter months, temperatures inside the SFCJ dropped so low that detainees

---

[1] Maurice Chammah, Your Local Jail May Be A House of Horrors, The Marshall Project (July 29, 2020), https://www.themarshallproject.org/2020/07/29/your-local-jail-may-be-a-house-of-horrors (last visited 6/21/2022).

could see their breath. The cold temperatures were not only uncomfortable, but also created unsafe and unhealthy conditions for Plaintiffs and others similarly situated.

60.    Detainees were generally provided with only one blanket, which was insufficient to keep warm in the SFCJ.

61.    Mr. Hopple asked jail staff to increase the heat and they refused. The SFCJ was cold while Mr. Mesey was there and the jail staff ignored detainee requests for heat. Ms. Rudigier's cell was so cold that she was able to store milk from breakfast in the open without concern of it spoiling.

62.    SF County, through its employees and final decision makers, willfully refused and failed to take reasonable measures to protect detainees from the cold temperatures during the winter months. Officials for SF County have shown deliberate indifference to the health of Plaintiffs and others similarly situated by failing to enact policies that would protect detainees from cold-related health issues.

## CLASS ALLEGATIONS

**Class Definitions**

63.    The named Plaintiffs bring this action on their own behalf and, pursuant to Fed. R. Civ. P. 23(b)(1) and/or (b)(3), as a class action for Count I[2] on behalf of a class of persons defined as:

> **Proposed Pretrial Conditions Class**: All persons who, from December 21, 2015 until the present were detained pretrial in the SFCJ. ("Pretrial Class")
>
>> **Proposed Subclass**: All persons who, from December 21, 2015 until the present were detained pretrial in a holding cell in the SFCJ. ("Pretrial Subclass")

---

[2] In Count I, Plaintiffs bring a class claim for unconstitutional conditions in violation of the Fourteenth Amendment. The other counts are brought by Plaintiffs as individuals.

64.     Under Fed. R. Civ. P. 23(a), certification of a class is appropriate where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

65.     This action is brought and may properly be maintained as a class action pursuant to 23(b)(1) and/or (b)(3), of the Federal Rules of Civil Procedure. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

## **RULE 23(a)**

**Typicality**

66.     Plaintiffs Mr. Hopple, Ms. Rudigier, and Mr. Mesey are all typical members of the Proposed Pretrial Class and Pretrial Subclass. Mr. Mesey is a typical member of the proposed Postconviction Class and Postconviction Subclass.

67.     The named Plaintiffs and members of the class each have a tangible and legally protectable interest at stake in this action.

68.     The claims of the named class representatives and the absent class members have a common origin and share a common basis. Their claims originate from the same illegal, unconstitutional practices of Defendant St. Francois County, and Defendant St. Francois County, Sheriff Bullock, and Administrator Smith act in the same way toward the Plaintiffs and members of the class. As such, each named Plaintiff has been the victim of the unconstitutional practices of one or more of the Defendants.

69.     The proposed class representatives state claims for which relief can be granted that are typical of the absent class members. If brought and prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely upon

the same remedial theories, and seek the same relief.

70.     The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interest of absent class members to ensure that the universal claims of the class will be prosecuted with diligence and care by the Plaintiffs as representatives of the class.

**Numerosity**

71.     The members of the class are so numerous that joinder of all class members is impracticable. Upon information and belief, the class consists of at least hundreds of persons. The class is ascertainable because the Defendants have the names and addresses of all class members.

**Commonality**

72.     The questions of law and fact common to the class include, *inter alia*:

   a.   Whether the unsafe and unsanitary conditions at the SFCJ described in this Complaint subjected detained individuals to a substantial risk of harm from unsanitary conditions.

   b.   Whether SF County officials failed to implement policies and practices necessary to remedy the unsafe and unsanitary conditions for detained individuals.

   c.   Whether SF County's acts and/or omissions which failed to provide safe and sanitary conditions for detained individuals reflect deliberate indifference to the health and safety of detainees and inmates.

   d.   What damages should be awarded to redress and compensate class members for the harms they suffered as a result of the conditions and conduct created by the unconstitutional policies and practices of SF County.

**Adequate Representation**

73.    The named Plaintiffs are willing and prepared to serve the Court and proposed classes in a representative capacity with all of the obligations and duties necessary. The Plaintiffs will fairly and adequately protect the interests of the class and have no interests adverse to, or which directly or irrevocably conflict with, the interests of other members of the class. The self interests of the named class representatives are co-extensive with and not antagonistic to those of the absent class members. The proposed representatives will undertake to protect the interests of the absent class members.

74.    The named Plaintiffs have engaged the services of attorneys from ArchCity Defenders, a firm with experience litigating complex civil rights matters in federal court; attorneys with the Simon Law Firm, a firm with extensive litigation expertise and class action experience; and Colianni & Colianni, a firm with extensive litigation experience related to the SFCJ as well as class action expertise.

75.     Said counsel are experienced in complex class litigation, will adequately prosecute this action, and will capably represent the named class representatives and absent class members.

**RULE 23(b)(1)**

76.    The prosecution of separate actions by individual members of the class would create a risk of adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

77.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications among individual members of the class that would establish incompatible standards of conduct for the parties opposing the class.

**RULE 23(b)(3)**

78.   The questions of law and fact common to members of the class predominate over any questions affecting only individual members.

79.   A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

    a.   Individual claims by the class members are impractical as the costs of pursuit far exceed what any one plaintiff or class member has at stake;

    b.   There has been no other litigation over the controversies herein and individual members of the class have no interest in prosecuting and controlling separate actions; and

    c.   The proposed class is manageable.

## INDIVIDUAL PLAINTIFFS' ALLEGATIONS

**<u>Robert Hopple</u>**

80.   Robert Hopple was booked into the SFCJ on criminal charges related to sexual misconduct involving a minor. Those charges were later dropped by the St. Francois County Prosecuting Attorney

81.   Robert Hopple was placed in a small holding cell immediately after his booking in May 2018. Mr. Hopple shared the cell with up to ten other men for roughly three days. Jail staff gave him a tattered, urine-soaked mat that was approximately a quarter of an inch thick with most of the stuffing missing and a thin blanket. The overcrowded conditions in the cell meant Mr. Hopple had to sleep on the floor underneath the cell's only bunk. The other men slept standing up or on the floor with their heads next to the toilet. It was unbearably hot and the air was stagnant in the holding cell. Mr. Hopple and others requested that the jail staff turn on the ventilation. The deputies either laughed at or ignored their requests. Mr. Hopple was not able to shower during

those three days.

82.     Mr. Hopple was initially unable to shower for two weeks until he received a hygiene pack from the commissary upon transfer to the general population. Even after receiving the hygiene pack, Mr. Hopple was unable to shower because the shower water was scalding hot. Mr. Hopple and other detainees requested the jail staff address the hot shower water. In response, the jail staff made the water so cold it was impossible to shower or bathe.

83.     The unsanitary conditions at the jail further complicated Mr. Hopple's ability to maintain adequate hygiene. Mr. Hopple saw thick black mold and slime on the walls and floors of the showers. The toilets would regularly overflow, and there was a lingering smell of sewage.

84.     During the last few weeks of Mr. Hopple's detention, the external temperature dropped below freezing; however, SFCJ staff refused to turn the heat on because they felt it was too early in the year to do so. It was so cold inside the facility that the sewage from Mr. Hopple's backed-up toilet froze on the floor inside his cell. He could see his breath, and the water from his cell faucet froze. Mr. Hopple and the other detainees wore socks on their hands and rocked back and forth in order to stay warm.

85.     Mr. Hopple received tiny portions of food consisting primarily of starches that were often moldy or discolored. Hot food was served barely warm. Although the servings were small, additional servings were almost never given. Sometimes, the deputies would bring four or five additional meals to offer to the approximately seventy male detainees on the condition that they correctly answer a trivia question. If the detainees answered the question incorrectly, the deputies would throw the food away. Mr. Hopple resorted to eating toothpaste and toilet paper to curb his hunger.

86.     A few months into his detention, Deputy John Doe transferred Mr. Hopple to a different pod. Deputy John Doe put him in a cell where two other detainees were waiting.

87.     Those detainees began hitting and kicking Mr. Hopple's head and face.

88.     Mr. Hopple tried to protect himself by putting his arms in front of his face.

89.     The assault continued for approximately ten minutes until the same deputy returned and escorted Mr. Hopple back to his previous pod.

90.     Mr. Hopple was told by other detained individuals that he was targeted for assault by the other detainees with the assistance of the deputies because of the nature of his charges.

91.     Mr. Hopple heard of other detained individuals with similar charges who were also assaulted.

92.     Mr. Hopple was bloodied and bruised after the assault and his front teeth were broken.

93.     Mr. Hopple informed Nurse Smith that he had been attacked, that he was in pain, and that he needed to see a doctor.

94.     Nurse Smith refused to provide Mr. Hopple with any medication to alleviate the pain.

95.     Nurse Smith also refused to take Mr. Hopple to see the doctor.

96.     Nurse Smith did not perform an evaluation of Mr. Hopple.

97.     For three days, Mr. Hopple remained in extreme and obvious amounts of pain, crying out for assistance.

98.     Mr. Hopple was in his cell and at times was in and out of consciousness. He did not have an emergency call button in his cell to request medical care, so he was forced to scream for help.

99.     Both Nurse Smith and the other jail staff ignored Mr. Hopple's cries.

100.    Eventually, the pain became so unbearable, and he was so desperate for relief, that Mr. Hopple pulled his own tooth.

101.    Mr. Hopple again requested pain medication from Nurse Smith, and she denied his request.

102.    Mr. Hopple never saw a doctor or a dentist, nor did he receive any medication following his assault.

103.    In June 2018, Mr. Hopple witnessed a detainee attempt suicide. The detainee had a rash on his back when he arrived at the jail; however, Nurse Smith refused to do an assessment or provide the man any medical treatment. After three days of detention, the man tore the thin blanket he was provided into strips and tied them together to make a rope. The man walked out into the communal area with the makeshift rope around his neck, tied a knot around the railing, and Mr. Hopple saw the detainee jump over the railing, attempting to hang himself. Mr. Hopple ran to the emergency call button and frantically pressed it to request emergency assistance from the deputies. The deputies responded by telling Mr. Hopple not to press the emergency call button. Meanwhile, other detainees tried to untie the man who was hanging from the railing but eventually the makeshift rope broke and the man fell approximately ten feet to the floor. Mr. Hopple continued to press the call button and the deputies eventually responded by asking what Mr. Hopple needed and he told them there was a man hanging himself. Approximately seven to eight minutes later, two deputies entered the pod and, prior to providing any medical attention to the man, made all the other detainees go into lockdown in their cells. The man laid on the ground for another three to four minutes before one deputy wheeled in the restraint chair, placed the unresponsive man in it, and wheeled him out of the pod. One of the deputies returned to the common area to untie the makeshift rope and began making fun of the man who just attempted suicide by acting as if he was choking himself and saying how "dumb the guy" was because he could not "tie a knot well enough to hang himself." Mr. Hopple never saw the detainee again.

104.    In July 2018, Mr. Hopple witnessed a man who complained of chest pains while

18

his extremities were turning purple. The other detainees pressed the emergency call button, but deputies did not respond. After approximately eight to ten minutes, one of the deputies arrived at the pod with a wheelchair. The deputy did not check on the man but, instead, made Mr. Hopple and others place the man in a wheelchair. The same deputy wheeled him out of the dorm and Mr. Hopple never saw the man again.

105.    The trauma associated with being detained at the SFCJ caused Mr. Hopple to experience increased depression and anxiety to the point he would not leave his home for several months upon his release. Mr. Hopple continues to experience depression and anxiety.

**Shawn Mesey**

106.    Plaintiff Shawn Mesey was incarcerated at the SFCJ approximately nine times between 2015 and the present date.

107.    Mr. Mesey was born with a left clubbed foot that causes substantial limitations in his daily living activities.

108.    Mr. Mesey was incarcerated at the Northeast Correctional Center ("NCC"), a facility within the Missouri Department of Corrections ("MDOC") from February 2017 until about early October 2017 pursuant to prior criminal charges. Mr. Mesey received a specialized shoe and medication to treat his anxiety and depression while in MDOC custody. Without the support of his specialized shoe, Mr. Mesey struggles to walk without stumbling and experiences constant pain, stiffness, and limited motion in his legs.

109.    On or about October 16, 2017, the St. Francois County Prosecuting Attorney filed a Writ of Habeas Corpus Ad Prosequendum, requesting Mr. Mesey's presence in SF County to face new criminal charges. The Twenty-Fourth Judicial Circuit issued the writ that day.

110.    Pursuant to the writ, Mr. Mesey was transferred from NCC to the SFCJ on or about October 19, 2017 to face new criminal charges. Mr. Mesey arrived at the SFCJ wearing his

specialized shoe. SFCJ correctional staffers booking Mr. Mesey into the SFCJ requested he remove the specialized shoe. Mr. Mesey communicated his need for the specialized shoe to SFCJ correctional staff, but they responded that he would not be allowed to keep his shoe. Mr. Mesey specifically mentioned his left clubbed foot, and his disability is obvious from his gait. SFCJ correctional staff denied his request to keep his shoe and sent him into the holding cell shoeless. Mr. Mesey remained shoeless until he left the holding area.

111.    Mr. Mesey requested access to his specialized shoe throughout his incarceration during 2017-2018. SFCJ staff denied each request. Administrator Smith told Mr. Mesey that he would not receive his orthopedic shoe because, at the SFCJ, "we don't do that."

112.    Mr. Mesey struggled to walk, climb stairs, or bathe without pain while detained at the SFCJ.

113.    In October 2017, after his intake assessment, jail deputies took Mr. Mesey to a small holding cell. The cell was filthy and overcrowded. There was one bunk and one sink for the multiple men housed in the cell. Mr. Mesey was given a dirty blanket and mattress to use to sleep on the floor.

114.    When Mr. Mesey and his fellow detainees requested showers, deputies would mace the men or put them in the restraint chair and beat them. For the twenty days Mr. Mesey was in the holding cell, he was not provided an opportunity to shower.

115.    The holding cell was in serious disrepair; there was mold, the cell was filthy, and the window was broken. When the weather was cold, wind would blow into the holding cell, and the cell was so cold, Mr. Mesey and other detainees called it the "ice cell."

116.    Eventually, Mr. Mesey moved from the holding cell to the general population where he was designated a pod "trustee" who would assist in maintaining order in the pods and to communicate between detainees and jail staff. As a trustee, Mr. Mesey made several complaints

to the deputies regarding the water temperatures in the showers. Most of the time, the showers were so hot that the water would scald Mr. Mesey's skin and he would have to use cups filled with cold water from the sink to mix with the shower water. When Mr. Mesey reported the extreme temperatures to jail staff, including Administrator Smith, the deputies told him that the boiler was broken and that a contractor would have to fix it.

117.    On several occasions, Mr. Mesey witnessed retaliation against detainees who complained about the shower temperatures or were not agreeable to the jail deputies. In response to shower complaints, the deputies would turn off the water or remove the hot water to make the shower water unbearably cold. Mr. Mesey recalls being without hot water in the shower two to three weeks at a time on multiple occasions.

118.    Mr. Mesey developed a toothache that required medical attention during his detention between December 2017 and January 2018. He reported the need for dental care to Nurse Smith. In response, Nurse Smith gave Mr. Mesey a medical request slip and told him that submitting the form would cost money. In great pain and in need of medical attention, Mr. Mesey filled out and returned the form. Nurse Smith approached Mr. Mesey the following day and, without any assessment or evaluation of his tooth, demanded that he gargle salt water. The ache remained so Mr. Mesey requested a pain reliever from Nurse Smith. She refused his request, demanding Mr. Mesey buy it from the canteen instead. Mr. Mesey did not have commissary funds, so he was unable to purchase pain medication. Mr. Mesey was never taken to seen a doctor or a dentist. For the remaining six months he was detained, Mr. Mesey endured severe tooth pain which limited his ability to eat or sleep.

119.    Mr. Mesey began receiving adequate healthcare only when he was returned to MDOC in June 2018. At that point in time, Mr. Mesey's tooth was so seriously decayed it had to be extracted.

120.    As a result of his experiences at the SFCJ, Mr. Mesey was diagnosed with Post Traumatic Stress Disorder. His anxiety and depression have also increased significantly.

**Stefani Rudigier**

121.    Ms. Rudigier was a pretrial detainee at the SFCJ from on or about the following dates, during which time she was subjected to various unconstitutional conditions:

       a.    March 5, 2017 to March 3, 2019; and

       b.    December 4, 2019 to January 9, 2020.

122.    Ms. Rudigier shared her medical history with the SFCJ booking employee, Ashley Bates ("Officer Bates"), upon entry in March 2017. Ms. Rudigier informed Officer Bates that she was previously diagnosed with bipolar disorder, anxiety, and depression.

123.    Upon information and belief, SF County has a custom or practice of not accommodating individuals with disabilities when they are booked into the SFCJ, including a custom of failing to properly document detainees' disabilities when they arrive at the SFCJ for booking.

124.    Upon information and belief, Officer Bates requested no assistance, no medical or disability evaluation or accommodations for Ms. Rudigier when she was booked in the SFCJ in March 2017.

125.    Ms. Ruidigier did not receive any medication for her bipolar disorder throughout her incarceration at the SFCJ.

126.    Ms. Rudigier was booked into a holding cell when she arrived at the SFCJ. The holding cell was small, filthy, and hot, and the women were not able to shower. There was one bed and one sink for the multiple women housed there. They found it difficult for their bodies not to touch because the holding cell was so small.

127.    Upon transfer to the female pod ("F Tank"), Ms. Rudigier found the conditions to be much the same. At one point during her detention, the toilet in Ms. Rudigier's cell backed up and was inoperable. It took several days for the jail to fix the issue. Meanwhile, Ms. Rudigier and her cellmates would cover the toilet to deal with the smell of sewage.

128.    Like Mr. Hopple and Mr. Mesey, Ms. Rudigier was not able to adequately bathe during her entire time at the SFCJ because of the extreme shower water temperatures. Ms. Rudigier recalls the shower water being so hot that other detainees would use it to cook their noodles.

129.    During her detention, the SFCJ staff also failed to meet Ms. Rudigier and other women's basic sanitary needs and failed to adequately provide menstrual products. For Ms. Rudigier, the failure to provide those items meant she was forced to bleed on herself and her clothes during her monthly menstrual cycle.

130.    SF County also failed to meet basic caloric and nutritional needs with its meals. Ms. Rudigier lost approximately 110 pounds during her detention due to the inadequacy of the meals. In addition to being unfresh, the meal portions were tiny and additional servings were very rare. On one occasion, Ms. Rudigier scrubbed the moldy walls and showers in her pod for three consecutive days just to earn extra food for one evening's dinner.

131.    Ms. Rudigier's cell was both unsanitary and cold. It was located in a corner of the pod where the temperature was so cold that Ms. Rudigier could preserve the milk she received during breakfast by sitting it in front of the cell door. Although she and her cellmate requested additional blankets, they were refused because their cell was not located on the back wall.

132.    SF County failed to provide adequate health care to detainees like Ms. Rudigier in some cases. She learned that there were two ways to request medical care at the SFCJ: using a medical request slip or by seeking out Nurse Smith. Either way, Ms. Rudigier learned she would be charged a fee for each medical request submitted, regardless of whether she actually received

care. Ms. Rudigier, knowing she would not be able to pay the charge, still made several requests for medical care because she needed help, but did not receive health care. Ms. Rudigier never received medical care for bipolar disorder while incarcerated in the SFCJ.

133.     SF County provided inadequate and delayed medical care to Ms. Rudigier at the SFCJ. Although Ms. Rudigier notified Officer Bates of her anxiety, depression, and bipolar disorder when she was booked into the SFCJ, she did not receive medication for her anxiety and depression until sometime in late 2018. Thus, Ms. Rudigier was denied medication for anxiety and depression for approximately 21 of her nearly 24 months of pretrial detention. In November 2018, nearly 21 months into her detention, Ms. Rudigier finally received medication for anxiety and depression. At no time did Ms. Rudigier see or speak with a physician or mental health professional prior to receiving that prescription.

134.     Without her medication, Ms. Rudigier experienced acute mental health symptoms and frequently found herself in tears. Ms. Rudigier made verbal and written requests to Nurse Smith for assistance. Her various requests to Nurse Smith were largely ignored. Other correctional staff observed a number of her mental health crises, but ignored her or punished her by locking her in her cell or sending her to "the hole." Ms. Rudigier would cry, hyperventilate, and beg for help but SFCJ staff routinely ignored her requests.

135.     Similarly, Ms. Rudigier received inadequate care for other medical needs. In March 2018, Ms. Rudigier began experiencing severe abdominal pain and unusual vaginal discharge. She requested medical assistance from Nurse Smith, who provided Ms. Rudigier an antibiotic for symptoms consistent with a yeast infection. Ms. Rudigier's symptoms persisted through the course of multiple rounds of antibiotics. A month later, Ms. Rudigier requested additional assistance from Nurse Smith and received a seven-day course of a different antibiotic. The second course of antibiotics did not alleviate Ms. Rudigier's symptoms, and Ms. Rudigier's pain and discharge

continued for several months.

136.    Five months later, after continued complaints from Ms. Rudigier about the vaginal discharge, odor, and discomfort, Nurse Smith prescribed another course of antibiotics. Still the antibiotics did not work, and Ms. Rudigier told Nurse Smith that she was experiencing abdominal pain.

137.    Ms. Rudigier feared there could be something wrong with her bladder and kidneys and shared that concern with Nurse Smith. Ms. Rudigier requested a medical evaluation and gave Nurse Smith a urine sample. The nurse did not share the test results with Ms. Rudigier but immediately gave her a fourth round of antibiotics. After seven to ten days, the medication failed to work, and Nurse Smith extended Ms. Rudigier's prescription for another three days.

138.    Ms. Rudigier's pain and discomfort continued, and, in January 2019, she received a fifth round of antibiotics from Nurse Smith. After months of pain, discomfort, and switching between powerful antibiotics with their own side effects, Ms. Rudigier gave up hope that she would get help to alleviate the pain and treat the discharge.

139.    Ms. Rudigier left the SFCJ two months after Nurse Smith prescribed the last round of antibiotics to her. When Ms. Rudigier was finally able to see a physician, outside of the jail, she was diagnosed with a gallbladder issue that required emergency surgery.

140.    Ms. Rudigier was diagnosed with Post Traumatic Stress Disorder in June 2019, months after leaving the cruel, inhumane, and punishing conditions of her pretrial detention at the SFCJ.

### CLAIMS FOR RELIEF

#### COUNT I
**Fourteenth Amendment, 42 U.S.C. § 1983—Cruel and Unusual Conditions**
**(Robert Hopple, Stefani Rudigier and Shawn Mesey Individually and as Class Representatives against St. Francois County)**

141.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

142.    Plaintiffs bring this Count I individually and on behalf of the members of the Class against Defendants pursuant to 42 U.S.C. § 1983 and Fed. R. Civ. P. 23.

143.    SF County is a person under 42 U.S.C. § 1983.

144.    SF County and its employees, agents, and representatives were, at all times relevant, acting under the color of ordinances, regulations, customs, and laws of the State of Missouri.

145.    Plaintiffs and the Class had Fourteenth Amendment rights to be free from conditions that amount to cruel and usual punishment, as described above, including:

      a.   overflowing sewage,

      b.   black mold and other toxic fungal species,

      c.   overcrowding,

      d.   understaffing,

      e.   lack of adequate hygiene,

      f.   lack of adequate nutrition,

      g.   extreme cold,

      h.   extreme shower temperatures; and

      i.   such further unconstitutional conditions that discovery reveals.

146.    The conditions described above were intentionally punitive, in violation of the United States Constitution.

147.    In the alternative, the conditions described above were arbitrary and not reasonably related to any legitimate penological goal, in violation of the United States Constitution.

148.    The conditions described above transgressed today's concepts of civilized

standards of confinement, in violation of the United States Constitution.

149.    The conditions described above deprived pretrial and postconviction detainees of the minimal civilized measures of life's necessities, in violation of the United States Constitution.

150.    SF County and its employees, agents, and representatives knew, or should have known, of these rights during the time period relevant to this complaint.

151.    SF County and its employees, agents, and representatives were deliberately indifferent to the excessive health risks created by the conditions at the SFCJ and have violated Plaintiffs' and the Classes' right to basic human dignity and to be free from cruel and unusual pretrial conditions under the Fourteenth Amendment to the United States Constitution.

152.    The acts or omissions of SF County and its employees, agents, and representatives as described herein, deprived Plaintiffs and the Class of their constitutional rights, resulting in unnecessary pain, suffering, and causing Plaintiffs and the Class to incur damages.

153.    SF County and its employees, agents, and representatives intentionally, knowingly, and purposely deprived Plaintiffs and the Class of their rights, privileges, and immunities as secured by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.

154.    SF County and its employees, agents, and representatives are policymakers for the SFCJ, and in that capacity, established policies, procedures, customs, and/or practices for the same.

155.    SF County and its employees, agents, and representatives maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens, which were the moving forces behind and proximately caused the violations of Plaintiffs' and the Classes' constitutional rights as set forth herein.

156.    As a direct result of the policies, practices and customs described herein, Plaintiffs and the Class have been subjected to the unconstitutional conditions above and are the proximate cause of Plaintiffs' and the Classes' deprivation of rights under the Fourteenth Amendment.

157.    Accordingly, Plaintiffs seek the relief outlined in the Prayer for Relief below.

## COUNT II
**Fourteenth Amendment, 42 U.S.C. § 1983—Deliberate Indifference Resulting in
Unconstitutional Punishment to Pretrial Detainee
(Robert Hopple against John Doe Correctional Officer and St. Francois County)**

158.    Plaintiff Robert Hopple incorporates by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

159.    Under the Fourteenth Amendment to the United States Constitution, Mr. Hopple, as a pretrial detainee, had a right to be free from pretrial punishment, which was violated when he was incarcerated under conditions posing a substantial risk of serious harm and this harm resulted from Defendants' deliberate indifference to the substantial risk of serious harm.

160.    Deputy John Doe put Mr. Hopple at risk of serious harm through his deliberate indifference to his safety while he was held as a pretrial detainee at the SFCJ.

161.    Upon information and belief, all SFCJ staff and Deputy John Doe specifically were aware of Mr. Hopple's criminal charges.

162.    Furthermore, upon information and belief, all SFCJ staff, and Deputy John Doe specifically, were aware that the nature of Mr. Hopple's criminal charges would make him a target of physical violence by other detainees at the SFCJ.

163.    Deputy John Doe intentionally put Mr. Hopple in a different pod and locked the cell so that two other detainees could assault Mr. Hopple.

164.    In the alternative, putting Mr. Hopple in a different pod and locked cell where two other detainees could assault Mr. Hopple amounted to deliberate indifference to a substantial risk of serious harm to an inmate.

165.    Mr. Hopple was harmed due to this action, as these two other detainees assaulted

him, causing him physical and psychological injury.

166.   Deliberately placing Mr. Hopple in a cell to permit other detainees to attack him clearly violated Mr. Hopple's constitutional rights.

167.   During all relevant times, SF County had a practice and custom of allowing detainee violence and assaults where some detainees were allowed by jail staff to prey on other, vulnerable detainees.

168.   SF County, as a practice and custom, has failed to supervise or discipline its employees by failing to prevent and respond to clear instances of unconstitutional employee behavior, as well as a practice and custom of tolerating instances where detainees are put into harmful and vulnerable positions.

169.   SF County's failure to hold officials accountable for misconduct is a cause of Mr. Hopple's injury, as the culture of non-accountability promoted harmful conduct at the SFCJ. SF County is therefore culpable for the constitutional violation set forth above, pursuant to *Monell v. N.Y. Dep't of Soc. Svcs*, 436 U.S. 658 (1978).

170.   Accordingly, Mr. Hopple seeks the relief outlined in the Prayer for Relief below.


### COUNT III
**Fourteenth Amendment, 42 U.S.C. § 1983—Failure to Provide Medical Care and Treatment**
**(Robert Hopple against Heather Smith and St. Francois County)**

171.   Plaintiff, Robert Hopple, incorporates by reference each and every allegation contained above as if set forth fully herein.

172.   As a pretrial detainee, Mr. Hopple had a right under the United States Constitution to be free from deliberate indifference to his serious medical needs. *Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016).

173.   SF County and Nurse Smith were deliberately indifferent to Mr. Hopple's serious medical needs when they failed to provide or obtain timely medical care for him in violation of his Fourteenth Amendment Rights after he was assaulted in the SFCJ.

174.   At all times, Defendants were acting under the color of state law.

175.   Deliberate indifference is found when a detainee has an objectively serious medical need and correctional staff have actual knowledge of, but deliberately disregard, such need. *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

176.   Mr. Hopple had an objectively serious medical condition for evaluation and treatment from a doctor and a dentist following his assault when he was covered in bruises and blood and had broken teeth.

177.   Defendants SF County and Nurse Smith acted with deliberate indifference when they failed to provide the necessary medical care or failed to ensure that the necessary medical care be provided.

178.   By failing to provide Mr. Hopple with the necessary medical care or failing to direct that medical care be provided, Defendants SF County and Nurse Smith disregarded a substantial risk of serious harm to Mr. Hopple's physical health.

179.   Due to SF County's and Nurse Smith's failure to provide Mr. Hopple with the necessary medical care, Mr. Hopple was forced to endure substantial and unnecessary pain by, *inter alia*, being forced to pull his own teeth out.

180.   The lack of timely evaluation and provision of dental care caused lasting damage to Mr. Hopple's teeth and gums.

181.   SF County is also liable for the custom and practice of ignoring detainee health needs or failing to provide medical treatment, and for failing to train and supervise its employees

to provide constitutionally adequate medical treatment.

182.    SF County deputies and other jail staff were not provided any specific training to work with detainees experiencing medical needs within the jail or sufficient training to identify and respond to medical emergencies.

183.    As a result, jail staff were selective and arbitrary in determining which medical conditions warranted medical evaluation and which did not. In some cases, this resulted in the exacerbation of serious medical conditions.

184.    Jail staff regularly ignored or failed to timely respond to detainees' requests for health care, sharing of health needs, or health emergencies.

185.    SF County did not ensure that detainees had a way to access medical help 24 hours a day due to the lack of call buttons in individual cells.

186.    Even when detainees were able to get the attention of Nurse Smith, she frequently ignored requests from detainees for medical treatment, even in cases of emergency, delayed responding to those requests, or withheld access to medical treatment altogether.

187.    Upon information and belief, Nurse Smith and the SFCJ staff faced little to no discipline or job consequences for ignoring detainee complaints or detainee medical needs.

188.    SF County purported to provide dental care but in practice would block or refuse to provide the care to detainees, even in emergencies.

189.    SF County was aware of the failures to provide inmates constitutionally adequate medical treatment through detainee complaints about delays in accessing health services and from detainees housed at the SFCJ experiencing unnecessary harm through preventable health emergencies.

190.    SF County was or should have been aware that it was not staffing the jail with employed or contract medical personnel who would be able to adequately address detainee health

concerns or medical emergencies.

191. Despite being aware that there were serious and systemic problems in its practices and customs regarding the provision of medical care, SF County took no steps to change its staffing, add training for deputies or other jail staff, provide supervision or discipline to its employees, or improve detainees' access to medical care.

192. SF County's custom and practice of failing to adequately train its staff to recognize and respond to medical and dental emergencies, custom and practice of understaffing, and the custom and practice of failing to discipline its staff was the moving force and proximate cause behind Mr. Hopple's injuries. SF County is therefore culpable for the constitutional violation set forth above, pursuant to *Monell v. N.Y. Dep't of Soc. Svcs*, 436 U.S. 658 (1978).

193. Accordingly, Mr. Hopple seeks the relief outlined in the Prayer for Relief below.

**COUNT IV**
**Violation of Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq.**
**Violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701, et seq.**
**Failure to Provide a Specialized Shoe**
**(Shawn Mesey against St. Francois County, Daniel Bullock, Dennis Smith, and Heather Smith)**

194. Plaintiff Shawn Mesey incorporates by reference each allegation contained above as if set forth fully herein.

195. Defendants SF County, Sheriff Bullock, and Nurse Smith violated Title II of the ADA by failing to provide Mr. Mesey with a specialized shoe or alternative accommodation for his clubbed foot.

196. Title II of the ADA states: "no qualified individual shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discimination by such entity." 42 U.S.C. § 12132.

197. The SFCJ is within the definition of a "public entity." *See Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998));

*see also Kutrip v. City of St. Louis*, 329 F.App'x. 683, 684-85 (8th Cir. 2009).

198.    To state a claim under the ADA and the RA, a plaintiff must show "(1) he is a person with a disability as defined by state; (2) he is otherwise qualified for the benefit in question; and (3) he was excluded from the benefit due to discrimination based upon disability." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999).

199.    Upon information and belief, at all times relevant to this complaint, the SFCJ received federal funding.

200.    Mr. Mesey is a qualified individual with a left clubbed foot.

201.    Mr. Mesey was booked into the SFCJ on or about October 19, 2017, after transfer from NCC.

202.    Upon information and belief, Mr. Mesey was diagnosed with anxiety, depression, and a left clubbed foot while in NCC.

203.    Mr. Mesey received a specialized orthopedic shoe for his left clubbed foot while at NCC.

204.    Mr. Mesey notified correctional staff, including Administrator Smith, of his clubbed foot and need of a specialized shoe when he was booked into the SFCJ on or about October 27, 2017. Administrator Smith told Mr. Mesey that he would not be allowed to keep his orthopedic shoe. Mr. Mesey notified Nurse Smith a day later of his need for his specialized shoe. Mr. Mesey also notified Nurse Smith at various points throughout his incarceration of his need for his specialized orthopedic shoe.  Mr. Mesey's mobility impairment is also obvious from his gait.

205.    Furthermore, SF County denied Mr. Mesey a specialized shoe throughout the entirety of his incarceration at the SFCJ, which lasted until or about June 13, 2018.

206.    Defendants SF County, Administrator Smith, and Nurse Smith acted with deliberate indifference to Mr. Mesey's rights under the ADA because they had actual knowledge

33

of his disability, knew that he was being denied a specialized shoe or similar accommodation, knew that an accommodation would allow him to ambulate safely, and nonetheless denied him that accommodation for 239 days.

207.    Accordingly, Mr. Mesey seeks the relief outlined in the Prayer for Relief below.

**COUNT V**
**Fourteenth Amendment, 42 U.S.C. § 1983—Failure to Provide Medical Care and Treatment**
**(Shawn Mesey against St. Francois County and Heather Smith)**

208.    Plaintiff Shawn Mesey incorporates by reference each and every allegation contained above as if set forth fully herein.

209.    As a pretrial detainee, Mr. Mesey had a right under the United States Constitution to be free from this deliberate indifference to his serious medical needs. *Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016).

210.    SF County and Nurse Smith were deliberately indifferent to Mr. Mesey's serious medical needs when they failed to provide or obtain timely medical care for him in violation of his Fourteenth Amendment Rights.

211.    At all times, Defendants were acting under the color of state law.

212.    Deliberate indifference is found when a detainee has an objectively serious medical need and correctional staff have actual knowledge of, but deliberately disregard, such need. *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

213.    Mr. Mesey was suffering from an objectively serious medical condition; in that he could not ambulate safely and without pain without a specialized shoe or similar accommodation.

214.    Mr. Mesey's disability is obvious.

215.    In addition, Mr. Mesey told jail staff upon arrival each time he was booked into the

SFCJ that he required accommodations, namely a specialized shoe.

216.    In fact, Mr. Mesey brought a specialized shoe issued by MDOC when he arrived at SFCJ in October 2017.

217.    Despite being aware that Mr. Mesey required this accommodation and despite Mr. Mesey having the specialized shoe, SFCJ staff told Mr. Mesey, "we don't do that here" and refused him access to this shoe.

218.    Nurse Smith was also made aware of Mr. Mesey's clubbed foot and refused to take any remedial action.

219.    Due to the denial of services for his clubbed foot, Mr. Mesey suffered physical pain and limited ambulation.

220.    Mr. Mesey was also suffering from an objectively serious medical condition, in that on or about December 2017, he developed severe dental pain, upon information and belief, an abscess in his mouth causing him great pain and discomfort.

221.    Nurse Smith was aware of this severe pain because Mr. Mesey verbally notified her and filled out a medical request slip.

222.    The only remedial action Nurse Smith took was to give Mr. Mesey a saltwater rinse.

223.    Mr. Mesey was not given medication for the severe tooth pain.

224.    At no point did Nurse Smith or any other SFCJ staff take Mr. Mesey to a dentist or a doctor to address this pain.

225.    Due to the actions of Nurse Smith, Mr. Mesey endured months of pain, and his tooth had to be extracted when he returned to MDOC.

226.    SF County is also liable for the custom and practice of ignoring detainees' health needs or failing to provide medical treatment, and for failing to train and supervise its employees to provide constitutionally adequate medical treatment.

227.    These deputies and other jail staff were not provided any specific training to work with detainees experiencing medical needs within the jail or sufficient training to identify and respond to medical emergencies.

228.    As a result, deputies and other jail staff were selective and arbitrary in determining which medical conditions warranted medical evaluation and which did not. In some cases, this resulted in the exacerbation of serious medical conditions.

229.    Deputies and other jail staff regularly ignored or failed to timely respond to detainees' requests for health care, sharing of health needs, or health emergencies.

230.    SF County did not ensure that detainees had a way to access medical help 24 hours a day due to the lack of a call button in individual cells.

231.    Even when detainees were able to get the attention of Nurse Smith, she frequently ignored requests from detainees for medical treatment, even in cases of emergency, delayed responding to those requests, or withheld access to medical treatment altogether.

232.    On information and belief, Nurse Smith and the jail staff faced little to no discipline or job consequences for ignoring detainee complaints or detainee medical needs.

233.    SF County purported to provide dental care but in practice would block or refuse to provide the care to detainees, even in emergencies.

234.    SF County was aware of the failures to provide inmates constitutionally adequate medical treatment through detainee complaints about delays in accessing health services and from detainees housed at the SFCJ experiencing unnecessary harm through preventable health emergencies.

235.    SF County was aware that it was not staffing the jail with employed or contract medical personnel who would be able to adequately address detainee health concerns or medical emergencies.

236.    Despite being aware that there were serious and systemic problems in its practices and customs regarding the provision of medical care, SF County took no steps to change its staffing, add training for deputies or other jail staff, provide supervision or discipline to its employees, or improve detainees' access to medical care.

237.    SF County's custom and practice of failing to adequately train its staff to recognize and respond to requests for medical care, custom and practice of understaffing, and the custom and practice of failing to discipline its staff was the moving force and proximate cause behind Mr. Mesey's injuries. SF County is therefore culpable for the constitutional violation set forth above, pursuant to *Monell v. N.Y. Dep't of Soc. Svcs*, 436 U.S. 658 (1978).

238.    Accordingly, Mr. Mesey seeks the relief outlined in the Prayer for Relief below.

### COUNT VI
**Violation of Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132, *et seq.***
**Violation of the Rehabilitation Act of 1973 ("Rehabilitation Act") §§ 701, *et seq.***
**(Stefani Rudigier against St. Francois County, Daniel Bullock, and Heather Smith)**

239.    Plaintiff, Stefani Rudigier, incorporates by reference each allegation contained above as if set forth fully herein.

240.    Defendants SF County, Sheriff Bullock, and Nurse Smith violated Title II of the ADA by failing to provide Ms. Rudigier with medical care for her disabilities.

241.    Title II of the ADA states: "no qualified individual shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

242.    The SFCJ is within the definition of a "public entity." *See Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998)); *see also Kutrip v. City of St. Louis*, 329 F.App'x. 683, 684-85 (8th Cir. 2009).

243.    To state a claim under the ADA, a plaintiff must show "(1) [s]he is a person with a

disability as defined by state; (2) [s]he is otherwise qualified for the benefit in question; and (3) [s]he was excluded from the benefit due to discrimination based upon disability." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999).

244.    "The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable.'" *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (quoting *Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996)).

245.    Upon information and belief, at all times relevant to this complaint, the SFCJ received federal funding.

246.    Ms. Rudigier is a qualified individual with three disabilities: anxiety, depression, and bipolar disorder that substantially limit her ability to think, concentrate, breathe, care for herself, learn, communicate with others, and work. The Eighth Circuit has found depression and anxiety to be qualifying disabilities under the ADA. *See Battle v. United Parcel Service, Inc.*, 438 F.3d 856, 862 (8th Cir. 2006). Similarly, "[b]ipolar disorder [is an impairment] under the ADA." *Goal v. Retzer Resources*, No. 5:09CV00137 JLH, 2010 WL 4867966, at *3 (E.D. Ark. Nov. 3, 2010).

247.    Furthermore, Ms. Rudigier notified Officer Bates of her disabilities when she was booked into the SFCJ on March 5, 2017. Upon information and belief, Ms. Rudigier also notified jail staff and Nurse Smith of her disabilities at multiple times throughout her incarceration at the SFCJ.

248.    Furthermore, Ms. Rudigier was denied reasonable access to appropriate medication to treat her mental impairments. Upon information and belief, SF County and Nurse Smith denied Ms. Rudigier medication and treatment for anxiety and depression for 21 months of her incarceration. Upon further information and belief, Ms. Rudigier was denied medical treatment for

bipolar disorder throughout her entire incarceration at the SFCJ.

249.    Ms. Rudigier is otherwise qualified for the benefits in question, namely meaningful access to all services, programs and activities offered at the SFCJ. *See Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999).

250.    Defendants SF County, Administrator Smith, and Nurse Smith acted with deliberate indifference to Ms. Rudigier's rights under the ADA because they had actual knowledge of her disability, knew that she was being denied treatment, saw her frequent outbursts, and nonetheless denied her appropriate accommodations including medication for a substantial portion of her incarceration.

251.    Accordingly, Ms. Rudigier seeks the relief outlined in the Prayer for Relief below.

### COUNT VII
**Fourteenth Amendment, 42 U.S.C. § 1983—**
**Deliberate Indifference to Medical Needs-Failure to Treat Bipolar Disorder, Anxiety and Depression**
**(Stefani Rudigier against St. Francois County and Heather Smith)**

252.    Plaintiff Stefani Rudigier incorporates by reference each allegation contained above as if set forth fully herein.

253.    As a pretrial detainee, Ms. Rudigier had a clearly established right under the United States Constitution to be free from deliberate indifference to her serious medical needs. *Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016).

254.    The acts and omissions of Defendants in failing to provide adequate medical care to Ms. Rudigier for anxiety, depression, and bipolar disorder despite her repeated professions of her disabilities and her repeated outbursts constitute deliberate indifference to Ms. Rudigier's serious medical needs. They thereby violate the Fourteenth Amendment to the U.S. Constitution.

255.    Deliberate indifference is found when a detainee has an objectively serious medical need and correctional staff have actual knowledge of, but deliberately disregard, such need.

*McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

256.   At all times, Ms. Rudigier had a serious medical need to receive treatment for anxiety, depression, and bipolar disorder, specifically treatment in the form of medicine or counsel from a competent medical professional.

257.   By failing to provide Ms. Rudigier with adequate medical care, Defendants knew of and disregarded a substantial risk of serious harm to Ms. Rudigier's mental health.

258.   In the alternative, Defendants made an intentional decision with regard to Ms. Rudigier's mental health care that put Ms. Rudigier at a substantial risk of suffering serious harm. Defendants did not take reasonable available measures to abate that risk, even though a reasonable medical professional in the circumstances would have appreciated the high degree of risk involved—making the conduct obvious.

259.   SF County is also liable for the custom and practice of ignoring detainees' health needs or failing to provide medical treatment, and for failing to train and supervise its employees to provide constitutionally adequate medical treatment.

260.   These deputies and other SFCJ staff were not provided any specific training to work with detainees experiencing medical needs within the jail or sufficient training to identify and respond to medical emergencies.

261.   As a result, deputies and other SFCJ staff were selective and arbitrary in determining which medical conditions warranted medical evaluation and which did not. In some cases, this resulted in the exacerbation of serious medical conditions.

262.   Deputies and other SFCJ staff regularly ignored or failed to timely respond to detainees' requests for health care, sharing of health needs, or health emergencies.

263.    SF County did not ensure that detainees had a way to access medical help 24 hours a day due to the lack of a call button in individual cells.

264.    Even when detainees were able to get the attention of Nurse Smith, she frequently ignored requests from detainees for medical treatment, even in cases of emergency, delayed responding to those requests, or withheld access to medical treatment altogether.

265.    On information and belief, Nurse Smith and the jail staff faced little to no discipline or job consequences for ignoring detainee complaints or detainee medical needs.

266.    SF County was aware of the failures to provide inmates constitutionally adequate medical treatment through detainee complaints about delays in accessing health services and from detainees housed at the SFCJ experiencing unnecessary harm through preventable health emergencies.

267.    SF County was aware that it was not staffing the jail with employed or contract medical personnel who would be able to adequately address detainee health concerns or medical emergencies.

268.    Despite being aware that there were serious and systemic problems in its practices and customs regarding the provision of medical care, SF County took no steps to change its staffing, add training for deputies or other jail staff, provide supervision or discipline to its employees, or improve detainees' access to medical care.

269.    SF County's custom and practice of failing to adequately train its staff to recognize and respond to emergencies, custom and practice of understaffing, and the custom and practice of failing to discipline its staff was the moving force and proximate cause behind Ms. Rudigier's injuries. SF County is therefore culpable for the constitutional violation set forth above, pursuant to *Monell v. N.Y. Dep't of Soc. Svcs*, 436 U.S. 658 (1978).

270.    Accordingly, Ms. Rudigier seeks the relief outlined in the Prayer for Relief below.

## COUNT VIII
### Fourteenth Amendment, 42 U.S.C. § 1983—
### Deliberate Indifference to Medical Needs-Failure to Address Abdominal Pain
### (Stefani Rudigier against St. Francois County, Heather Smith, and Advanced Correctional Healthcare)

271.    Plaintiff Stefani Rudigier incorporates by reference each allegation contained above as if set forth fully herein.

272.    As a pretrial detainee, Ms. Rudigier had a clearly established right under the United States Constitution to be free from this deliberate indifference to her serious medical needs. *Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016).

273.    The acts and omissions of Defendants in failing to provide adequate medical care to Ms. Rudigier for abdominal pain despite her repeated professions of her abdominal pain constitute deliberate indifference to Ms. Rudigier's serious medical needs. They thereby violate the Fourteenth Amendment to the U.S. Constitution.

274.    Deliberate indifference is found when a detainee has an objectively serious medical need and correctional staff have actual knowledge of, but deliberately disregard, such need. *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

275.    At all times, Ms. Rudigier had a serious medical need to receive treatment for abdominal pain, specifically treatment in the form of medical consultation with a doctor or competent medical professional who would assess her abdominal pain and treat the cause.

276.    Both Nurse Smith and Dr. Pewitt were aware of Ms. Rudigier's serious and persistent abdominal pain from Ms. Rudigier's frequent verbal and written complaints.

277.    By failing to provide Ms. Rudigier with adequate medical care, Defendants knew

of and disregarded a substantial risk of serious harm to Ms. Rudigier's mental health.

278.    In the alternative, Defendants made an intentional decision with regard to Ms. Rudigier's health care that put Ms. Rudigier at a substantial risk of suffering serious harm. Defendants did not take reasonable available measures to abate that risk, even though a reasonable medical professional in the circumstances would have appreciated the high degree of risk involved—making the conduct obvious.

279.    The Defendants' failure to provide medical care caused Ms. Rudigier to suffer months of pain and contributed to her need for gallbladder removal surgery.

280.    SF County is also liable for the custom and practice of ignoring detainees' health needs or failing to provide medical treatment, and for failing to train and supervise its employees to provide constitutionally adequate medical treatment.

281.    These deputies and other jail staff were not provided any specific training to work with detainees experiencing medical needs within the jail or sufficient training to identify and respond to medical emergencies.

282.    As a result, deputies and other jail staff were selective and arbitrary in determining which medical conditions warranted medical evaluation and which did not. In some cases, this resulted in the exacerbation of serious medical conditions.

283.    Deputies and other jail staff regularly ignored or failed to timely respond to detainees' requests for health care, sharing of health needs, or health emergencies.

284.    Upon information and belief, ACH did not consistently appear at the SFCJ to assess detainees' health, including failure to take and assess patient medical histories issues and failure to examine medical emergencies. SF County did not ensure that detainees had a way to access medical help 24 hours a day due to the lack of a call button in individual cells.

285.    Even when detainees were able to get the attention of Nurse Smith, she frequently ignored requests from detainees for medical treatment, even in cases of emergency, delayed responding to those requests, or withheld access to medical treatment altogether.

286.    Upon information and belief, Nurse Smith and the jail staff faced little to no discipline or job consequences for ignoring detainee complaints or detainee medical needs.

287.    SF County was aware, or should have been aware, of the failures to provide inmates constitutionally adequate medical treatment through detainee complaints about delays in accessing health services and from detainees housed at the SFCJ experiencing unnecessary harm through preventable health emergencies.

288.    SF County was aware, or should have been aware, that it was not staffing the jail with employed or contract medical personnel who would be able to adequately address detainee health concerns or medical emergencies.

289.    Despite being aware that there were serious and systemic problems in its practices and customs regarding the provision of medical care, SF County took no steps to change its staffing, add training for deputies or other jail staff, provide supervision or discipline to its employees, or improve detainees' access to medical care.

290.    SF County's custom and practice of failing to adequately train its staff to recognize and respond to medical emergencies, custom and practice of understaffing, and the custom and practice of failing to discipline its staff was the moving force and proximate cause behind Ms. Rudigier's injuries. SF County is therefore culpable for the constitutional violation set forth above, pursuant to *Monell v. N.Y. Dep't of Soc. Svcs*, 436 U.S. 658 (1978).

291.    Similarly, ACH's custom or practice of failing to take appropriate medical histories, triage detainee medical concerns and appear at the SFCJ are the moving force and

proximate cause behind Ms. Rudigier's injury.

292.   Accordingly, Ms. Rudigier seeks the relief outlined in the Prayer for Relief below.


## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiffs Robert Hopple, Shawn Mesey, and

Stefani Rudigier request the following relief from this Court:

A.   Enter judgment in Plaintiffs' favor and against Count I Defendant, including;

    i.   Issue an order certifying this count as a class action, and;

    ii.   Award Plaintiffs and class members monetary damages as the Court deems appropriate, as well as all litigation costs, expenses, and attorney's fees recoverable under federal law; and

B.   Enter judgment in Robert Hopple's favor and against Count II Defendants, including:

    i.   Award him compensatory damages; and

    ii.   Award his costs, including reasonable attorney's fees under 42 U.S.C. § 1988 and other relevant provisions of law.

C.   Enter judgment in Robert Hopple's favor and against Count III Defendants, including:

    i.   Award him compensatory damages; and

    ii.   Award his costs, including reasonable attorney's fees under 42 U.S.C. § 1988 and other relevant provisions of law.

D.   Enter judgment in Shawn Mesey's favor and against Count IV Defendants, including:

    i.   Award him all economic losses on all claims as allowed by law;

    ii.   Award compensatory and consequential damages, including damages for emotional distress, embarrassment, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial; and

    iii.   Award attorney's fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

E.    Enter judgment in Shawn Mesey's favor and against Count V Defendants, including:

      i.    Award him compensatory damages; and

      ii.   Award his costs, including reasonable attorney's fees under 42 U.S.C. § 1988 and other relevant provisions of laws.

F.    Enter judgment in Stefani Rudigier's favor and against Count VI Defendants, including:

      i.    Award her all economic losses on all claims as allowed by law;

      ii.   Award compensatory and consequential damages, including damages for emotional distress, embarrassment, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial; and

      iii.  Award attorney's fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

G.    Enter judgment in Stefani Rudigier's favor and against Count VII Defendants, including:

      i.    Award her compensatory damages; and

      ii.   Award her costs, including reasonable attorney's fees under 42 U.S.C. § 1988 and other relevant provisions of law.

H.    Enter judgment in Stefani Rudigier's favor and against Count VIII Defendants, including:

      i.    Award her compensatory damages; and

      ii.   Award her costs, including reasonable attorney's fees under 42 U.S.C. § 1988 and other relevant provisions of law.

I.    For such other and further relief as this Court deems just and proper.

Dated: July 7, 2022              Respectfully submitted,

                                  ARCHCITY DEFENDERS, INC.

                                */s/ Brandon Lamar Jackson*
                                Brandon L. Jackson (MBE #68159MO)
                                Stephen Ryals (MBE#34149MO)
                                Maureen Hanlon (MBE#70990MO)
                                440 N. 4th Street, Suite 390
                                Saint Louis, MO 63102

855-724-2489
314-925-1307 (fax)
bjackson@archcitydefenders.org
sryals@archcitydefenders.org
mhanlon@archcitydefenders.org

/s/ Vincent Colianni, II
COLIANNI & COLIANNI, L.L.C.
Vincent Colianni, II, #768VI
Marina Leonard, #R2058VI
Colianni & Colianni, LLC
4001 Village Run Rd.
Wexford, PA 15090
(340) 690-0629
vinny@colianni.com
marina@colianni.com

/s/ Kevin M. Carnie, Jr.
THE SIMON LAW FIRM, P.C.
Kevin M. Carnie Jr. (MBE #60979MO)
John M. Simon (MBE #68393MO)
Patrick R. McPhail (MBE #70242MO)
800 Market Street, Suite 1700
St. Louis, Missouri 63101
(314) 241-2929
(314) 241-2029 /(fax)
kcarnie@simonlawpc.com
jmsimon@simonlawpc.com
pmcphail@simonlawpc.com

*Attorneys for the Plaintiffs*